Our first case is CeramTec v. CoorsTek, 2023-15-02. Ms. Ellsworth. Good morning, Your Honors, and may it please the Court, Jessica Ellsworth for Appellant CeramTec. This case asks whether the color pink is functional when applied to hip joint components, and thus not a protectable trade dress. The answer is no. Just like pink insulation or green-gold dry-cleaning pads, CeramTec's pink hip components are also protectable. The Board reached a contrary conclusion based on incorrectly applying the Supreme Court's traffics decision and misreading the patents. It then disregarded independent scientific testing without explaining why, and it got the evidence wrong on alternative designs and costs. Starting with traffics, which is where the Board's analysis went sideways. I took it from the Board's opinion that there was considerable evidence that with functional properties in mind, chromium at various levels was added to otherwise altered components to make up the ceramic for purposes that there was a fair bit of evidence that certainly at the time your company touted as helping make the overall material a better material, whether hardness or toughness or truly functional properties. And for at least some of those compositions, pink just arrives naturally out of the choice of functional components. And the Board said there was enough evidence for that, and therefore you can't get a forever protection against other people using pink because that would give you a forever protection against their creating these compositions. What's wrong with that? I think there are a couple problems with that, Your Honor. And I'd start with the fact that this patent doesn't assign any specific functionality to 0.33 weight percent chromium, which is, as Your Honor pointed out, what does result in a pink ceramic. But the patent doesn't assign any functionality to that as opposed to... I'm sorry, but the two trademark registrations cover that. The two trademark registrations do cover that. And they will cover a number of different possible uses of chromium that turn out to be pink. So, Your Honor, I think that if I'm understanding your question, the trade dress does cover a pink hip implant component, the Biolex Delta, which is what our client sells, and C5 wanted to imitate that color, so they approached chromium as a colorant to turn their white product the same color that Ceramtech's product is. That was their goal. They did not approach chromium with an eye to improving hardness of their product in any way. They had been telling the market for years that their white product was, in fact, better than the pink product that Ceramtech was selling. I think traffics... So it's important to keep in mind that when traffics came up to the Supreme Court, the Court rejected the idea that a past utility patent is somehow a per se or automatic bar against later trade dress. And the Supreme Court's decision makes clear that there is room for both utility patents that cover functionality and trade dress, as long as what you are getting the trade dress on is not, in fact, a functional aspect of the product. And there is really no evidence in this case that 0.33 percent weight percent chromium plays a functional role in this ceramic material. But 0.33 is within the scope of the claim of the 816 utility patent that you acknowledge is what your product is an embodiment of that claim, correct? It does practice that claim because it falls within the range. This patent covers really millions of compositions because it requires certain molar ratios and volume percentages and weight percentages of multiple constituent elements, aluminum, zirconium, chromium. Since it does cover your embodiment that you market, that means there's substantial evidence for the Board's finding that the first of the Morton Norwich factors favors a finding of functionality, doesn't it? I don't think that's right. And in part it's because the range of chromium that's covered in this patent results in ceramics of really all colors. They can be white, they can be red, they can be purple, they can be yellow, they can be gray, they can be black. So the functionality that's described in the patent is not particular to anything that falls within that range of chromium, that range of colors. If you look at Qualitex, which is the Supreme Court's decision on a color tray dress, the Court was clear that even if having some color is functional, in that case it was the green gold color on the dry cleaning pads, that that doesn't in and of itself mean that all color is functional. And I think that the same reasoning applies here, where there is a wide variety of colors that result from the chromium range that's described in the patent, and that chromium range is assigned a standard functionality in the patent. It doesn't describe any particular end of that range as being more or less useful. And in fact, we know now from the German Institute testing, as well as testing that the parties have done in this case, that there is in fact no functional benefit to the ceramic composition that comes from this very tiny percent of chromium that's included. I did want to ask you about the German evidence. First of all, you said it was summarily disregarded by the Board, but I don't understand how we could ever say that. There are extensive proceedings here, and I know in Colorado before, and the Board spends something like eight pages addressing or at least outlining the German evidence. Your Honor, I think you can say it for the same reason that in Nuvasiv, this Court rejected a similar error, which was to essentially summarize the evidence and then just offer a conclusion without any reasoning. And that is what the team found. But wasn't the reasoning they found the expert of the other side more persuasive than your expert? That is the one line that's included in the TTAB's decision. It does say that without any explanation of why. And the lack of an explanation is really important. Because if you look at what that expert's criticisms were, his first criticism, his primary criticism was, well, you shouldn't give any weight to the German testing because this material is so hard to begin with that you can't actually measure the incremental hardness from chromium. It's just not measurable. That should give the Court some pause, that if it's not measurable, how is it playing a functional role? His second criticism was that the German institute testing was not done in the body. No testing of ceramic implants is ever done in the body. And, in fact, when you want to locate the analysis on the exact hardness impact of different levels of chromium, which is what the German institute was doing, it would make no sense to do it in the body. But why isn't all of the back and forth about the German evidence a fact dispute that the Board was privileged to resolve and it all goes into that first Norton Norwich factor and you're not happy with how they resolved it, but you haven't shown there's not substantial evidence for how they resolved it? Well, I think we have shown that there is not substantial evidence for a number of things. There's the traffic's error up front, which I think is not a substantial evidence error. The traffic's error is really the legal weight that should be assigned to a patent where the central feature that's claimed in the patent is not the same as what's in the trade dress. There is no claim in the patent that is specific to 0.33 weight percent chromium, the color pink used for ceramic hip components. So we have this legal error up front. Then we have a substantial evidence error. And the way I think of it, Judge Stark, is that the German institute testing is the equivalent of direct evidence of a lack of functionality, while the other Norton Norwich factors really are more like circumstantial evidence. And, of course, you can often prove a case through circumstantial evidence. Direct evidence is often not available. But here it was available. And the TTAB just really summarily brushed it aside based on a set of criticisms that it gave this court no basis to determine if the TTAB's analysis of those criticisms was valid or not. And I think that is, as I mentioned, the Nuvasiv case is a prime example where this court has said it is not enough to simply summarize evidence and then say that one side wins or loses. You have to explain why. On substantial evidence, the TTAB's errors went further because it found the cost factor and the alternative factor were neutral when, in fact, there was no evidence that it was any less expensive to make a pink product. In fact, the evidence cut the other way. It was more expensive. And on alternatives, the C5 itself has an alternative. There was a blue actual product that was identified as an alternative with the same properties as Biolex Delta. And the addition of chromium, everybody agrees, can result in a wide variety of colors. Chromium actually is derived from the Greek word chroma, which means color. So chromium does not equate to pink. And so I think the board had a problem not just with the traffic's error up front, but then also with the way it disregarded the German studies or brushed them aside without engaging in the criticisms that our expert had offered into the record about why their expert's criticisms essentially made no sense. And then we have errors on both cost and the alternative design as well. There's one more thing that I would mention that I think reflects the PTAB's misunderstanding of this patent. The PTAB found that the 816 patent assigned functional benefits to chromia that went beyond hardness. And it said the patent spoke to toughness and stability. And that is an indication that I think the PTAB really didn't understand this patent. Because the patent describes toughness as coming from zirconia. It is in fact a zirconia-toughened aluminum. And the stability that's described in the patent comes from stabilizing oxides, not from chromia. So there are many ways of looking at what the PTAB did that show it misunderstood the patent, it misunderstood traffic, and it made errors in the substantial evaluation of the rest of the evidence. I'd reserve the remainder of my time for rebuttal. We will stand before you, Mr. Horowitz. Thank you, Your Honor, and may it please the Court. I want to start with my friend's observation or contention that there's no evidence in our record that 0.33 percent chromia is functional. And for that, I'd point the Court to the undisputed findings on Morton Norwich Factor II. So recall that it is undisputed that 0.33 percent chromia is functional. And that Ceramtech conditioned the market over many years to understand that the pinkness in its patented ceramic material came from adding a specific amount of chromia to make the material harder. And then, Judge Tronte, you mentioned you can't get a forever monopoly. There's also an undisputed finding in that same section on Morton Norwich Factor II that the Board's impression was that they sought trademark protection specifically to stave off competition in the wake of the expiration of their patents. So they have conditioned the market to understand that when you see pink, that is functional. And then why is 0.33 percent important? Your phrase conditioned the market to think, I'm not quite sure what to make of it. I think that maybe one version of the other side's pitch is that they turned out to be wrong about a whole slew of assertions about the role of chromium. And now that we know the truth, there just isn't any functional reason to do something that turns out to be pink. So their contention is that what they told the market and what they described in the patent was actually wrong all along. That's true. And there is a fact question that is not really any of the Morton Norwich factors, but in that other consideration section of the Board opinion, about whether the best understanding of the science today is that chromia is, in fact, functional. That's a fact question that, as Judge Stark, you pointed out, the Board... Is it enough for you that it is reasonable to think, even if one doesn't know for sure, that chromia at pink-causing levels may well sometimes be functional? I mean, I think the findings in the Board's opinion are stronger, but I think that would be sufficient. So this is all about competition, right? Ultimately, we're trying to compete in a market that understands and has been educated to understand. This is the undisputed finding at page 95 of the Board's opinion. Well, maybe that was all, what's the phrase today? Misinformation. So, again, whether it was as factual, there's competing expert evidence. The findings went our way, not theirs, including, I think, footnote 231 is particularly strong on this. The Board wasn't willing to cast aside decades of research in peer-reviewed literature by experts in the field in light of some more recent evidence from Dr. Michalski. But supposing the Board had gone the other way. I guess I'm just trying to understand how much here depends on concluding that the Board had substantial evidence to discount all this late-breaking research from the German scientists who were saying something like the opposite for a long time. I don't think much rides on it. So one path to affirmance, which is the most straightforward, I think, is to say it's a factual dispute. On a scientific question of functionality, it goes our way. Another path to affirmance is it's not clear that it would go our way, and nonetheless, under Morton Norwich, balancing each of the four factors, one of them is that there is a utility patent that discloses the utilitarian advantages. That goes our way. It's strong evidence. It's also strong evidence under Morton Norwich Factor II, and again, undisputedly strong evidence. Counsel, the Board relied heavily on the 816 patent. That patent, if I read it accurately, doesn't even mention pink, and it mostly describes materials with zirconia. So the patent by itself doesn't mention pink. That's true. That's why the Board's findings crucially rely on the combination of the patent's disclosures and the admissions from CeramTec that, number one, Biolox Delta practices the patent, and, number two, the chromia in implementing the patent causes it to be pink. Now, in terms of the zirconia question, I would actually say if you look at the key passage at the bottom of 3 to the top of 4 of the 816 patent, as well as the key moment in the prosecution history where they're overcoming the prior art, the patent is at 1238 and the prosecution history is 1728, so the patent's in volume 2, the file history's in volume 3. But anyway, in both cases, what CeramTec is telling the public and telling the patent office is that the problem is combining good toughness with great hardness, and the solution is a very specific molar ratio among the constituent elements, zirconia on the one hand and chromia on the other. So chromia imparts the hardness that counteracts the loss of hardness from the zirconia, which is added to toughen. It's the combination of all the elements in that ceramic matrix that allows you to get the combination of desired mechanical properties, and those are the superior mechanical properties that CeramTec told the public it should associate with pinkness. So you've got Morton-Norwich factor 1, it goes our way. Morton-Norwich factor 2, it goes our way. And then you weigh the factors and ask the ultimate factual question, which is the board's question to answer, is this functional under Morton-Norwich? Substantial evidence supports it, even if you weren't so sure in the other considerations part of the opinion about what to make of the late-breaking German studies that were from the German litigation as against the weight of the evidence from decades of research going the other way. CeramTec argues that you didn't suggest that the patents disclose any advantages from the chromium other than hardness, but yet the board purported to find other advantages that you didn't even try to prove. Is that fair? I think we focused on hardness. I think the best way to understand what the board is doing there has to do with the mix point that I was making before. The problem identified in the patent is how do you get the mix of mechanical properties you're looking for? Good hardness, good toughness combined with great hardness is how it's described. It's true, I think, although there's some evidence suggesting chromium might have other properties, it's true that zirconia was added primarily for toughness and chromium was added primarily for hardness and the stabilizing agents were there for stabilization. But it is the matrix together that is the great invention. And if you look at that file history, they're trying to overcome hardness. It's very closely related to that. I think I'm remembering, just tell me if I'm off on this, that the zirconia was increased or something for toughness. They recognized there was a price being paid in hardness and chromium basically reduced that price. That's right. That's a fair way to describe it. And in fact, they mentioned in their brief that any amount of chromium will do and actually the very same discussion... It's conceivable to say that you have chromium in order to enable you to get the toughness which actually comes from the other thing. That's exactly right. And it was known that zirconia could increase toughness. So it wasn't as if the great invention was, oh, let's add zirconia for toughness. The thing they said to distinguish their invention from the prior art was the very specific molar ratio of the constituent elements that balances the desired mechanical properties. And in their commercial implementation, that was pink. So I take it you would have us read the board's findings about toughness and stability beyond hardness as reflecting this sort of mixed idea. Can you tell me where you made that argument or presented evidence to that effect? Because I'm just concerned that maybe the board was out on its own without a record to support what it's saying. So I cannot tell you offhand where that specific argument came, although I know that, and maybe my colleague will find it in our petitioner brief, if you wanted to look at it, it's 158T tab. But you believe you've made this. I know that we talked about the balance of zirconia and chromium. I don't know if we captured it exactly that way, but let me be clear. They're not making a waiver argument. The board was free to make findings of fact in favor of functionality based on the record before it. And so whether or not we made the argument, the board made the finding, and the finding is supported by substantial evidence. So while we'll see if I can grab it quickly, it's sort of neither here nor there because it's not a waiver argument. The board made the finding. The finding is supported by substantial evidence. It's what the patent is all about. It's what their development materials are all about. On the German evidence, what's your response to the contention that the board did a sort of invasive error and maybe they summarized the evidence in eight pages, but they didn't really tell us why they were persuaded by your side? A couple of points here. I mean, the real question for an invasive is can the board's path through the evidence reasonably be discerned? Can you tell what the board was doing? And what the board did over several pages was describe the evidence, describe the contentions on both sides. And then on page 99, it's true, the sentence they focus on, they say, Dr. Carty's criticisms were persuasive, criticisms of this new scientific evidence. So you can tell what the board's thinking, but there's a little bit more than that. In the footnote that's attached to the same sentence, footnote 228, the board mentions a number of things and they refer back to a credibility issue for Dr. Michalski related to his assessment of the new scientific evidence. And the credibility issue mentioned earlier on page 65 is that he failed to disclose that he had an interest in the litigation when he was sought to be a peer reviewer in connection with one of those articles. So they question his credibility. And then a couple of pages later in a footnote I already mentioned, footnote 231, that carries over from pages 101 to 102, they make the broader point, it's in the context of something else, but it's a broader point, that they're not going to cast aside decades of research, as Dr. Michalski invited them to, in light of these new studies. So I think he put these things together. And not only can a path be reasonably ascertained, it's a clear and totally reasonable path, which is they were, keep in mind the context, they saw dozens of articles, and even on this new studies, they didn't just see the institute. That's what the other side wants to focus on now. There were several studies that the other side talked about, and so they had a lot to deal with in a 106-page opinion, and with respect to this one study that is the focus of the appeal, they said, look, we're crediting Dr. Cardi over Dr. Michalski, who, by the way, has shown some issues on credibility with respect to this new science, as they call it, and we're not going to cast aside decades of research pointed in the other direction in light of these litigation-driven issues. And I think that the appendix site for the brief below that may have this is 19.622, deep in volume six or seven of the joint appendix. Can I ask you this question? It's not going to be a very precise question. So the trade dress here covers a pink cup or the ball. Pink may arise in various ways without particularly wanting to get pink. You're trying to get a variety of functional properties. What is the right inquiry when you just don't know what all of the mixes of chromium and other things will turn out to, what properties, what functional properties, toughness, hardness, whatever, they will have, and some of them will turn out to be pink and some of them won't. Put inside the facts of this case, is the board supposed to say, well, until such time as science reveals that something covered by this pink trade dress has a functional property, it can be registered, but once it is newly discovered that 20% or something ratio for chromium is a real sweet spot for functional properties and that just turns out to be pink, at that point the trade dress is no longer valid? How does that work? Yeah, I mean, I think, without talking about the facts for a moment, I think that this question sort of gets at a broader problem or difficulty with functionality, which is in value engineering. Everything that is part of a product is functional in some sense, right? So the question that the cases are trying to get at is, what is the kind of functional that should be legally relevant? And the best tools I can offer for you to answer that question are the tools that the courts have developed over time. So you look at the Morton Norwich factors. You look at whether there's a utility patent. You look at how they're advertising it. In the context specifically of this case vis-à-vis some of the others, I think it's also relevant, why was pink chosen? And so they rely heavily on the McGarrelates case. I'm sorry, by them? By them initially. Ms. Ellsworth made a point about why you chose pink. I'd like you to address that at some point. Sure. So let me just first on their choice, because I think it goes to the McGarrelates case that they rely on so heavily. One of the reasons why there was a fact issue for trial in McGarrelates, you know, the pattern, there's a lot of ways to implement the patent in that case, but the pattern of raised dots on the absorbent material, there was testimony that was chosen for an ornamental reason, because it looked nice, right? Well, that tends to suggest that it's not functional. Whereas in this case, the pink was arrived at by happenstance when they were optimizing their commercial implementation of the patent, and it just happened to be pink. That tends to support functionality. Okay, this is a good place for you to talk about why you chose it. Yeah, so why did we choose it? I mean, they rely heavily on this story that they seem to think is a sort of gotcha story about the Home Depot paint swatch. And if you look at the testimony, which is at 13666 and on for a few pages, about where that arose, we had a customer, you know, ultimately we're providing components, if I may finish, we're providing components for the hip implant system. And we have a customer saying, we want something that is pink, because customers understand that that's the next generation material, and has the same equivalent properties. And our response was, great, give us one of the hip balls and we'll basically reverse engineer it, which is perfectly consistent with traffics. They couldn't give us a hip ball. They couldn't give us a piece of the hip ball. And so we did the best we could, which is match the color with a paint swatch and go back and land on the exact chromia content that customers had come to associate with the pink superior properties and also with the superior hardness. One quick question, sorry, on unclean hands affirmative defense. You say the board exercised its discretion and didn't make a categorical rule, it's unavailable. What would be the basis for that discretion to just simply dismiss an unclean hands defense? I think Loughlin provides all the answer that you need. I mean, what Loughlin says is that the public interest in cancellation proceedings to rid the register of their generic marks, here functional marks, transcends the equitable defense. That sounds like a categorical rule, though, not a case-specific discretion. I think it's case-specific. I mean, it could end up applying categorically. You could apply the same rule in each case. It could turn out that if the evidence were particularly strong on unclean hands and the evidence were particularly weak on the functionality, maybe the board in the future would make a different decision. And our point in the brief is that this is a non-presidential board opinion, so every future board is free to make whatever discretionary decision it wants. Thank you, Your Honor. Thank you, counsel. Ms. Ellsworth, we'll give you four or three minutes. Thank you very much, Your Honor. I want to start with a point that you made, Judge Laurie, which is that the 816 patent doesn't say pink anywhere in it. Nothing in the patent says pink is useful over any other color for a ceramic hip implant. That is one reason that the Morton Norwich Factor I doesn't go their way. A second reason that drafts... I mean, if you had a patent that was all about turmeric or something, is turmeric the one that's yellow? Yeah, so it's all about turmeric, and so everything's going to be yellow. Why is this any different from that? It's very different than that because this patent is about red and pink and off-white and purple and white and gray and yellow and black. Just on the point whether the patent says pink, if it actually says do the following, make the following composition, and you agree that's pink. Because then I think you would be in a situation that's much closer to traffics, where you have a dual spring mechanism for stopping the wind and you have a dual spring mechanism as a trade dress. It just is a match, and that match is what doesn't exist here. Judge Toronto, as you pointed out, ceramic tech was wrong, and traffics itself explicitly recognizes that there could be situations where a patent holder was wrong. You can see this at page 32 of traffics, where it points out that the patent holder in that case did not assert that any of the representations in the patent are mistaken or inaccurate. Here, that is exactly what we are asserting. The third point I want to make is that C5 does not practice this patent. They have their own formulation that they use. They got them to a white product. This patent was never a bar to C5 coming on the market with a pink product. And so when they tell you it's important for competition, that they needed to have access to this. They have two products. One has a little P and one has a little S, and basically everybody wants the P, and that's the pink one, right? That is right. But that could be because it is a source identifier with a superior quality of ceramic tech's product, and source identifiers are certainly protectable as trade dress. Nuvasiv asked about, as my friend on the other side said, whether there is a path through the evidence. There is no path discernible here. Why is it persuasive to find that a hardness boost that cannot be measured, that was not conducted under circumstances in a body, is in fact a reason to discount these German studies? Two quick last points I'll try to make with my last bit of time. I would encourage you to look at that page of the appendix that my friend on the other side pointed you to, 19622. You will see nothing in it that speaks to chromium adding anything beyond hardness. In fact, you can look at 19596-97, 19621-24. That's the entirety of their argument, and nothing in that speaks to anything beyond hardness. The last point, and this is in response to your question, Judge Toronto, about why ceramic tech ended up with a pink product. It was trying to optimize the yttria that was used in its product, and it was varying the yttria. At the time, it was using yttria chromite. The chromium level that was chosen originally was a function of the yttria level. It had nothing to do with any hardness impact from chromium. In fact, before this product came on the market, yttria was available to manufacture without being yttria chromium. Ceramic tech stuck with pink because it liked the pink product, and it liked the ability to market the pink product. For all of these reasons, we would ask that you reverse the TTAB's decision and remand. Thank you, Your Honor. Thank you, Counsel. The case is submitted.